Earl W. TAFT et al.

v.

Eric R. CERWONKA et al.

Earl W. TAFT et al.

v.

ALLSTATE INSURANCE COMPANY.

No. 79–336–Appeal.

Supreme Court of Rhode Island.

Aug. 5, 1981.

Revens & DeLuca, Ltd., Amato A. DeLuca, Warwick, for plaintiffs.

Charles H. Anderson, Providence, for defendant Allstate Ins. Co.

## OPINION

MURRAY, Justice.

The plaintiffs, Earl W. Taft and his wife, Marian F. Taft, brought this civil action to recover for the alleged wrongful death of their daughter, Beverly A. Taft (Beverly), alleging that the negligence of the defendant Eric A. Cerwonka (Cerwonka) in operating a motor vehicle was the proximate cause of their daughter's death. Because the defendant Cerwonka, and the defendant Richard A. Miller (Miller), the owner of the vehicle, were uninsured at the time of the fatal mishap, the plaintiffs also filed a complaint against their insurer, Allstate Insurance Company (Allstate) under the uninsured-motorist provisions of their policy. Prior to trial, the two suits were consolidated.

The facts giving rise to this action are as follows. In the fall of 1976, Beverly, a ninth-grade student at Winman Junior High School, lived at home with her parents in the Potowomut section of Warwick. Beverly's friend, Lauren Cesana (Lauren), who attended Tollgate High School, also lived at home with her parents in that same section of the city. At approximately 6:30 p. m. on the evening of November 2, 1976, Lauren walked from her home to the Taft residence to meet Beverly. Approximately thirty minutes after Lauren's arrival, Beverly and Lauren left the Taft residence and walked to Angelo's, a neighborhood variety store which, according to Lauren, was a gathering place for local youths. After another half-hour or forty-five minutes had elapsed, Beverly and Lauren decided to visit some friends. Because the home of the friends they desired to visit was not within walking distance and because neither Beverly nor Lauren had a driver's license, they decided to look for someone to offer them a ride.

A few minutes after the girls' decision, along came defendant Cerwonka driving a 1965 Buick Skylark that was owned by his roommate, defendant Miller. According to Lauren, who was an acquaintance of Cerwonka, he parked the car and went into Angelo's to purchase a soda. Before he entered Angelo's, Cerwonka offered a ride to Lauren and Beverly and they accepted.

It is not disputed that shortly after the trio left Angelo's and proceeded up Ives Road, Cerwonka lost control of the vehicle; as a result, it left the road, first striking a guy wire attached to a utility pole and immediately thereafter striking the pole itself. Beverly, who was seated next to the front-seat passenger door, died as a result of the injuries she sustained in the collision.

Prior to trial, plaintiffs moved for partial summary judgment on the issue of whether they would be able to "stack" the uninsured-motorist coverage provided for each automobile on the one policy underwritten by defendant Allstate. Such motion was granted by a justice of the Superior Court.[1]

---

1. The record indicates that Allstate filed a notice of appeal to this court from the judgment entered granting partial summary judgment to plaintiffs; however, Allstate subsequently

The matter then proceeded to trial in the Superior Court. After all parties had rested, defendant Allstate moved for a directed verdict, stating "that if there is a verdict for the plaintiff, and I see no reason why at this juncture that the verdict for the plaintiff should not be entered, that the jury be instructed and directed that the verdict should be the minimum verdict of five thousand dollars * * *." The trial justice denied this motion and then gave his instructions to the jury, which returned a verdict in favor of plaintiffs in the sum of $33,000. Subsequently, Allstate moved for a new trial on the issue of damages, and it also moved the court to enter judgment against it in the amount of $10,000, the amount it contended was the limit of its liability under the policy issued to plaintiffs. The trial justice's denial of these motions and his entry of judgment in the amount of $20,000 (the aggregate limits of Allstate's liability) against defendant Allstate forms the basis of its present appeal.

### I

In passing upon defendant's contention, we are called upon to determine an issue of first impression in this jurisdiction. That issue is whether plaintiffs should be permitted to "stack" the uninsured-motorist coverage provided for each of the two automobiles insured by Allstate.

Because the fact situations in "stacking" cases tend to be similar and because the Rhode Island uninsured-motorist statute[2] is typical of those in other jurisdictions, decisions of other courts that have confronted this issue merit analysis here. In those jurisdictions where intra-policy stacking has been allowed,[3] courts have advanced one or more of three general theories in support of their decisions. *See* Comment, *Intra-Policy Stacking of Uninsured Motorist and Medi-*

cal Payments Coverage: To Be or Not To Be, 22 S.D.L.Rev. 349 (1977). One theory advanced is the theory that the applicable provisions of the insurance contract are ambiguous and that such ambiguities are to be resolved against the insurer. For example, in *Jeffries v. Stewart*, 159 Ind.App. 701, 309 N.E.2d 448 (1974), the Supreme Court of Indiana found an ambiguity in that the separability clause and the limits-of-liability clause conflicted with each other. The court resolved the ambiguity in favor of the insured and allowed him to stack the limits of liability. *See Id.* at 709, 309 N.E.2d at 453.

Another theory cited in support of stacking is that the particular jurisdiction's uninsured-motorist statute requires such a result. Representative of this class of cases is *Tucker v. Government Employees Insurance Co.*, 288 So.2d 238 (Fla.1974). In that case, the Supreme Court of Florida held that their uninsured-motorist statute, Fla. Stat.Ann. § 627.727 (West 1977) "does not disclose any statutory basis for a 'stacking' exclusion in a policy combining auto liability coverage for two or more automobiles of the named insured with uninsured motorist coverage included." *Id.* at 241.[4] Another court in *Holloway v. Nationwide Mutual Insurance Co.*, 376 So.2d 690 (Ala.1979), held that the jurisdiction's uninsured-motorist statute *mandated* stacking for the primary insured.

A final theory is the double-premiums theory, under which courts have held that the payment of separate premiums for uninsured-motorist coverage for each vehicle covered by the policy entitles the insured to stack the limits of liability for each insured vehicle of the policy. A recent case espousing this view is *Kemp v. Allstate Insurance Co.*, Mont., 601 P.2d 20 (1979).

withdrew its appeal before the case was docketed in this court.

**2.** Our statute is G.L.1956 (1979 Reenactment) § 27–7–2.1.

**3.** Intra-policy stacking is the aggregation of the limits of liability for uninsured-motorist coverage of each car covered in one policy, whereas

inter-policy stacking involves the aggregation of coverage under more than one policy.

**4.** We note here that the legislature in the State of Florida has since passed antistacking legislation. *See* Fla.Stat.Ann. § 627.4132 (West 1977).

In the jurisdictions where intra-policy stacking has not been allowed, courts have attempted to discredit each of the above theories. In *Grimes v. Concord General Mutual Insurance Co.,* N.H., 422 A.2d 1312 (1980) the Supreme Court of New Hampshire discarded the double-premium theory, stating:

"Neither can we agree, with confidence that the plaintiff is paying an extra premium without receiving something in return. When an insured owns two vehicles that are constantly available for use, not only by him, but by members of his family and others, the risk that someone operating one of those vehicles will be involved in an accident with an uninsured motorist is obviously greater than if only one vehicle were available for use. Consequently, an insurance carrier's exposure to that risk may be enhanced. Other courts have recognized that the second premium paid on the second car does afford some extra protection that otherwise would not exist." [Citations omitted.] *Id.* 422 A.2d at 1315.

The court went on to hold that their uninsured-motorist statute did not require intra-policy stacking.[5]

We note that the *Grimes* case is part of a significant minority of authority. *See Hampton v. Allstate Insurance Co.,* 126 Ariz. 403, 616 P.2d 78 (1980); *Sharples v. General Casualty Co. of Illinois,* 85 Ill. App.3d 899, 41 Ill.Dec. 176, 407 N.E.2d 674 (1980); *Pettid v. Edwards,* 195 Neb. 713, 240 N.W.2d 344 (1976).[6] However, the clear trend of late has been in favor of stacking. *See Holloway v. Nationwide Mutual Insurance Co.,* 376 So.2d 690 (Ala.1979); *Safeco Insurance Companies v. Vetre,* 174 Conn. 329, 387 A.2d 539 (1978); *Davis v. Hughes,* 229 Kan. 91, 622 P.2d 641 (1981); *Ohio Casualty Insurance Co. v. Stanfield,* 581 S.W.2d 555 (Ky.1979); *Breaux v. Government Employees Insurance Co.,* 373 So.2d 1335 (La.App.1979); *United States Fidelity and Guarantee Co. v. Pearthree,* 389 So.2d

109 (Miss.1980); *Linderer v. Royal Globe Insurance Co.,* 597 S.W.2d 656 (Mo.App. 1980); *Kemp v. Allstate Insurance Co.,* Mont., 601 P.2d 20 (1979); *Blocker v. Aetna Casualty and Surety Co.,* 232 Pa.Super. 111, 332 A.2d 476 (1975); *Landvatter v. Globe Security Insurance Co.,* 100 Wis.2d 21, 300 N.W.2d 875 (1980). We find the reasoning of the courts in the mainstream of this trend to be the more logical and equitable of the two approaches.

It is not disputed that plaintiffs paid two separate premiums for uninsured-motorist coverage; nevertheless, Allstate contends that to allow stacking is to render a "tortured" construction of the policy and of our uninsured-motorist statute. To give credence to Allstate's contentions, however, would defeat the reasonable expectations of a policyholder.

"It is reasonable to expect the same coverage where comparable premium dollars are paid to insure the same two cars, for convenience, under a single policy. A combination coverage should not be the predicate for an exclusion of coverage. Such a result would allow a simple change in form to defeat the insured's reasonable expectation, as well as the substance of law." [Citation omitted.] *Allstate Insurance Co. v. Maglish,* 94 Nev. 699, 703, 586 P.2d 313, 315 (1978).

Indeed if plaintiffs had insured their automobiles under two separate policies and had paid uninsured-motorist premiums for each car, they would be entitled to $20,000 in uninsured-motorist coverage from Allstate. Under these circumstances we find persuasive the statement of dissenting Justice Douglas of the Supreme Court of New Hampshire in *Grimes v. Concord General Mutual Insurance Co.,* N.H., 422 A.2d at 1317, that

"[i]t is an anomaly that if the same two premiums were paid to two *different* companies, we would permit *inter*-policy stacking of 'as many uninsured motorist

---

5. See N.H.Rev.Stat.Ann. § 268:15–a.

6. For a compendium of earlier cases denying stacking, *see* Comment, *Intra-Policy Stacking of Uninsured Motorist and Medical Payments Coverages: To Be or Not To Be,* 22 S.D.L.Rev. 349, 351 n. 10 (1977).

policies as are applicable to him, up to his total damages,' *Courtemanche v. Lumbermens Mut. Cas. Co.*, 118 N.H. 168, 173, 385 A.2d 105, 108 (1978), but because the two different coverages were both purchased from the same insurer, we do not." (Emphasis in original.)

Other cases have reflected the same view, e. g., *Traveler's Insurance Co. v. Pac*, 337 So.2d 397 (Fla.App.1976); *Breaux v. Government Employees Insurance Co.*, 373 So.2d 1335 (La.App.1979); *Allstate Insurance Co. v. Maglish*, 94 Nev. 699, 586 P.2d 313 (1978).

■ We hold therefore that under the circumstances of this case where plaintiffs have paid two separate premiums providing each vehicle with uninsured-motorist coverage, they are entitled to recover under the uninsured-motorist provisions of the policy sums found legally recoverable up to the aggregate sum of the motor vehicles so insured. *Accord, Kemp v. Allstate Insurance Co.*, Mont., 601 P.2d 20, 24 (1979). We are careful to limit our holding on this issue to cases factually similar to the one at bar, for we foresee and rue the day when our reasoning may be twisted to achieve an absurd result. For example, what is the result to be if a plaintiff was injured while riding in an automobile which was insured as only one of a fleet of cars? We defer decision on this and related issues until a case with the appropriate factual setting presents itself for review.[7]

## II

Allstate next contends that the trial justice committed error by denying its motion for a directed verdict for plaintiffs in the amount of $5,000, the minimum amount recoverable under our wrongful-death statute at that time. See G.L.1956 (1969 Reenactment) § 10–7–2. The gravamen of defendant's contention is that because plaintiffs did not introduce expert testimony on

the issue of the decedent's prospective earnings, there was insufficient evidence for the case to go to the jury.

■ In passing on a motion for a directed verdict, the trial justice, and this court on review, is bound to examine the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences from the record in favor of the nonmoving party's position. Neither the trial justice nor this court may assess the credibility of witnesses or the weight of the evidence in ruling upon such a motion. *E. g., DaVinci Creations, Inc. v. Nu-Frame Co.*, R.I., 418 A.2d 851 (1980); *Carnevale v. Smith*, R.I., 404 A.2d 836 (1979).

With the foregoing as our guide, we note that the proof required to establish pecuniary damages in wrongful-death cases is set out in G.L.1956 (1969 Reenactment) § 10–7–1.1, as enacted by P.L.1971, ch. 146, § 1. That section provides:

"Pecuniary damages to the beneficiaries described under § 10–7–2 of this chapter and recoverable by such persons shall be ascertained as follows:

"1. Determine the gross amount of the decedent's prospective income or earnings over the remainder of his life expectancy, including therein all estimated income he would probably have earned by his own exertions, both physical and mental.

"2. Deduct therefrom the estimated personal expenses that the decedent would probably have incurred for himself, exclusive of any of his dependents, over the course of his life expectancy.

"3. Reduce the remainder thus ascertained to its present value as of the date of the award. In determining said award, evidence shall be admissible concerning economic trends, including but not limited to projected purchasing power of money, inflation and projected increase or decrease in the costs of living."

7. In these circumstances even in those jurisdictions where intra-policy stacking for two or three vehicles is allowed, courts have uniformly denied such an extension of the stacking theory. *See, e. g. Holloway v. Nationwide Mutual Insurance Co.*, 376 So.2d 690 (Ala.1979); *Ohio*

*Casualty Insurance Co. v. Stanfield*, 581 S.W.2d 555 (Ky.1979); *Linderer v. Royal Globe Insurance Co.*, 597 S.W.2d 656 (Mo.App.1980); *Continental Casualty Co. v. Darch*, 27 Wash.App. 726, 620 P.2d 1005 (1980).

In an effort to satisfy these requirements, plaintiffs introduced the testimony of several witnesses. The plaintiffs themselves each testified as to Beverly's personal expenses, including expenses for food, clothing, and medical care.[8] There was also testimony regarding her age, her personality, and her academic performance. To establish the decedent's work life expectancy, plaintiffs called Edward V. Barlow, state law librarian, to the stand. Mr. Barlow had in his possession the Vital Statistics of the United States Life Tables, volume 2, section 5. From these tables, Mr. Barlow testified that a female's work life expectancy began at age 20 and that the work life expectancy of such a person was 41.2 years. He further testified that these tables indicated that the present value of $6,236,[9] discounted at the rate of 4 percent, was $124,676.97. The same figure discounted to present day value at the rate of 5 percent was $107,847.87; and at 6 percent, the figure was $94,400.57. We note that defendant did not object to the use of these tables; however, it did move for a directed verdict immediately following the close of all evidence, stating, among other things, that only an economist or an actuarial expert could provide proof of the average earnings of a high school graduate.

In denying the motion for directed verdict, the trial justice stated:

"This is * * * the first death case that I have presided over where there has not been an economist expert witness. However, it is not necessary in all cases to have economists testify. The criterion by which I must be guided is whether there is enough evidence on each one of these three steps from which the jury can make a determination. I am satisfied that there is enough evidence for the jury from which they could make a reasoned conclusion as to what the gross earnings of this decedent would be over her remaining work life from twenty to the time she retires which has been testified to as forty-one years. There is also evidence before this jury as to what her personal expenses were while she was living which were paid for by her parents, of course, at that time. The jury can draw conclusions from that evidence as to what her estimated personal expenses would have been had she lived to majority and thereafter. There is also evidence presented by Mr. Barlow through various tables as to the present value of one dollar at four, five and six percent and the jury can simply make calculations from that evidence. Therefore, it seems to me there is sufficient evidence before this jury from which they can arrive at the net loss to the decedent's estate if she had lived and there is sufficient evidence from which they can determine whether or not there should be an award above the minimum of five thousand dollars which is provided by statute. Therefore, under the circumstances the defendants' motions are denied."

█ It is abundantly clear from the above that the trial justice properly performed his function in ruling on defendant's motion. As we said in *Romano v. Duke*, 111 R.I. at 466, 304 A.2d at 51, "[t]he ultimate award in a wrongful-death action is based upon a series of predictions none of which involve absolute certainty. Damages, in such circumstances, are truly incapable of precise proof." Accordingly, on the basis of the record before us, we will not disturb the trial justice's denial of defendant's motion for directed verdict.

### III

█ Finally, Allstate ascribes error to the trial justice's denial of its motion for a new trial. The reasons advanced by Allstate in support of this motion are the same ones it cited in support of its motion for a directed verdict. As we have said so often in the past, the duty of the trial justice in

8. Had Beverly been employed, business expenses also would have been deducted from the award. *See Romano v. Duke*, 111 R.I. 459, 304 A.2d 47 (1973).

9. Apparently, this figure was derived from the earnings of Earl W. Taft, decedent's father, minus the living expenses incurred by the deceased.

ruling on a motion for a new trial is to consider, in the exercise of his independent judgment, all of the material evidence in the case in the context of his charge to the jury and to assess the credibility of the witnesses and the weight of the evidence. On that evidence, the trial justice decides whether to approve the verdict even against doubts as to its correctness because the evidence is nearly balanced or is of such a nature that reasonable minds may draw differing conclusions therefrom, or he may set aside the verdict if he, in the exercise of his independent judgment, concludes the verdict is not a proper response to the evidence. *E. g., Yammerino v. Cranston Tennis Club, Inc.*, R.I., 416 A.2d 698 (1980); *Barbato v. Epstein*, 97 R.I. 191, 196 A.2d 836 (1964). On appeal we will not disturb the trial justice's decision unless he overlooked or misconceived material evidence or was otherwise clearly wrong in performing his function. *Galusha v. Carlson*, R.I., 386 A.2d 634 (1978).

In the instant case the trial justice reviewed the evidence and concluded that the verdict was responsive to the evidence adduced at trial. He stated in his decision that

"[t]his was a fifteen year old girl who had no real earning experience or history. She was a ninth grader in school with an expectation of graduating from high school. Evidence was presented concerning the earnings of her parents, both her mother and father, who were high school graduates. Evidence was also presented as to the expenses incurred by her mother and father for her maintenance and living expenses and also evidence was presented on life expectancy and the present value of the dollar through the law librarian so the jury had evidence from which it could decide this case. Admittedly the determination of damages in a death case is the most unsatisfactory area of the law. Courts often say that the jury shall not speculate in determining damages but it is absolutely clear that in this area the jury has to speculate. The court has to speculate. Everyone has to speculate and really it is a shot in the dark. So what I'm essentially saying is that in a case of this kind reasonable minds can differ substantially on the question of damages. As I view this case the jury could have come in with a verdict for the plaintiffs anywhere from the statutory minimum of five thousand to something over a hundred thousand dollars and I would have concluded that that was in the realm of reasonableness in this case. I simply will not substitute my judgment for that of the jury in a case of this kind. As a matter of fact if I had decided this case jury waived my award would have been higher. It would have been more towards the fifty, sixty thousand dollar category. The jury came in with thirty-three thousand dollars. I cannot fault them for doing the best they could with what they had to work with and it is certainly not indispensable in a case of this kind to have an economist testify about the average income of a high school graduate and the average expenses of that type of a person over a lifetime. Those figures are just as speculative as anything that was put into this trial with a whole series of assumptions about whether people are going to get married, not going to get married, how many children they are going to have, what portion of a person's expenses are to be allotted to children and other things of that sort. I have listened to enough of that testimony from economists to make my head spin and frankly the evidence in this case was just as satisfactory as the testimony offered by any economist on this subject. Therefore, I am satisfied that this verdict of thirty-three thousand dollars for the plaintiff is in the realm of reasonableness * * * and the defendant, Allstate's motion for a new trial on the issue of damages is denied."

Again it is plainly evident from the record that the trial justice properly performed his function. He concluded that reasonable minds could differ, and, indeed, based upon this record, we cannot fault him for such a finding. Although the testimony of an expert may have aided the plaintiffs'

case, it was not indispensable to it, especially in a case such as the one at bar wherein the evidence as to the decedent's prospective earnings, whether introduced by expert testimony or by the use of actuarial tables, is speculative at best. *Cf., Renault v. John Hancock Mutual Life Insurance Co.*, 98 R.I. 213, 200 A.2d 588 (1964) (held not error for trial justice to refuse to permit a doctor to give his opinion regarding the precise date of death when doctor previously testified that any answer to that question would have been pure speculation).

Accordingly, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed, and the case is remanded to the Superior Court.