DECISION
"The problem with communication . . . is the illusion that it has beenaccomplished."
-George Bernard Shaw
The case before the Court presents unique and challenging factual circumstances revolving around a life and death decision made in an urban hospital emergency department. Hasbro Children's Hospital ("the Hospital"), the pediatric division of Defendant Rhode Island Hospital, is located on the Southside of Rhode Island's capital city and serves an ethnically diverse population, many of whom speak limited or no English.[1] It is the tragic convergence of English and Spanish language comprehension, emergency department procedures and protocols, and the death of an eleven-day-old infant, Jancy Castillo-Monterroso, that bring this medical negligence matter before the Court for decision. *Page 2 
 I Factual Findings and Travel
Over the course of a five-week bench trial, the parties presented 20 witnesses and offered 80 exhibits for the Court's consideration. Based on the extensive testimony and evidence adduced at the trial, this Court makes the following findings of fact.
During the early morning hours of September 15, 2001, in an upstairs bedroom at 167 Cleveland Street in Providence, seven-day-old infant Jancy Castillo-Monterroso began to cry. (Tr. 11/13/08, PM Session at 23:22-23.)[2] The wailing baby roused her mother, Plaintiff Julia Castillo-Monterroso ("Julia"), who was sleeping beside the child in the same bed. Id. at 23:4-19. Once awake, Julia began to breastfeed her daughter. Id. at 23:22-25. As she nursed Jancy in bed, Julia fell back to sleep. Id. at 24:12. When Julia next awoke, she saw that her daughter was not breathing. Id. at 24:15-16. Julia became hysterical. She began yelling and screaming and cried out for help. Id. at 24:16-21.
Julia's husband, Plaintiff Jorge Castillo[3] ("Jorge"), and his older brother, Guillermo Castillo ("Guillermo"), were downstairs watching television. (Tr. 11/21/08, AM Session at 33:15-24; Tr. 11/25/08, PM Session at 29:9-10.) Upon hearing Julia's anguished reaction, both men rushed to the upstairs bedroom. (Tr. 11/21/08, AM Session at 34:4-5; Tr. 11/25/08, PM Session at 29:25.) Guillermo, the first through the bedroom door, saw that Jancy was not breathing and commenced an effort to revive the child. (Tr. 11/21/08, AM Session at 34:7-35:1.) *Page 3 
He gave rescue breaths, chest compressions, and blew on Jancy's fontanelle. (Tr. 11/21/08, AM Session at 34:23 — 35:6; Tr. 11/25/08, PM Session at 30:7-12.) As Guillermo performed his ministrations, Jorge telephoned 911. (Tr. 11/25/08, PM Session at 31:15.)
James Taylor, a Lieutenant in the Providence Fire Department's Dispatch Division, answered Jorge's call at 2:57 a.m. (Pls.' Ex. 1: Providence Public Safety Incident Report.) Lt. Taylor contemporaneously dispatched rescue personnel to the Castillo residence. Id. The incident report generated pursuant to Jorge's phone call featured the notation "POSS HEART," a commonly used term that dispatchers sometimes employ to indicate patient chest pain, difficulty breathing, or a heart condition. (Pls.' Ex. 1; 11/12/08 Test. of James Taylor.)
Providence Fire Engine 6 arrived on-scene at 3:01 a.m. (Pls.' Ex. 1.) Upon his arrival, Firefighter Kevin Donoghue entered the Castillo residence and proceeded to the upstairs bedroom. (Defs.' Ex. J: Witness Statement of Kevin Donoghue at 1.) There, Donoghue observed that Jancy "was crying" and "had some blood around the nose area." Id. In attempting to determine what had happened, Donoghue perceived "a language problem." Id. Accordingly, Guillermo tried to demonstrate to Donoghue what had transpired through the use of signs and gestures.[4]
(Tr. 11/21/08, AM Session at 39:2-3.)
Shortly thereafter, at 3:09 a.m., Rescue Lieutenant John Woodard's ambulance arrived at the Castillo house. (Tr. 11/25/08, AM Session at 28:11.) Firefighter Donoghue appraised Lt. Woodard of the situation at hand by telling Woodard that Julia had fallen asleep while breastfeeding Jancy. (Defs.' Ex. L: Witness Statement of John Woodard.) Inside the residence, Lt. Woodard observed that Jancy had good color and was crying. (Tr. 11/25/08, AM Session at 13:21-25.) Additionally, Lt. Woodard noted a speck of blood just below one of Jancy's nostrils. *Page 4 Id. at 14:9. Lt. Woodard attempted to ask the Castillos some questions; however, he was unable to elicit answers because of a perceived "language barrier." (Defs.' Ex. L.) Subsequently, Lt. Woodard documented his inability to directly communicate with the Castillos by writing the phrase "+ language barrier" in the "Narrative" section of his run report. (Pls.' Ex. 6: EMS Ambulance Run Report.)
As the rescue responders evaluated the baby, the Castillos decided that Guillermo would accompany Julia and Jancy to the Hospital because Guillermo could communicate in English more effectively than Jorge. (Tr. 11/13/08, PM Session at 30:10-13; Tr. 11/25/08, PM Session at 34:24 — 35:2, 35:12-15.) Consequently, Julia, Jancy, Guillermo, and Lt. Woodard boarded the patient compartment of the ambulance. (Tr. 11/21/08, AM Session at 40:22 — 41:2; Tr. 11/25/08, AM Session at 20:4-5.)
The ambulance departed 167 Cleveland Street at 3:14 a.m. (Tr. 11/25/08, AM Session at 28:16; Pls.' Ex. 1.) En route, Lt. Woodard telephoned the Hospital to apprise the staff of the incoming infant. (Tr. 11/25/08, AM Session at 21:18; Pls.' Ex. 6.) Defendant Dr. Gregory Lockhart, the on-duty attending physician, received Lt. Woodard's call. (Tr. 12/1/08, AM Session at 14:23.) Dr. Lockhart documented his conversation with Lt. Woodard in a Hospital logbook pursuant to his regular practice. Id. at 15:6-14. However, the Hospital logbook record documenting the substance of the conversation between Lt. Woodard and Dr. Lockhart was never produced at trial. Id. at 16:2-10.
Upon the arrival of the ambulance at the Hospital, Jancy was first evaluated by triage nurse Blake Mouch. (Pls.' Ex. 6, Signature of Person Receiving Patient.) In his capacity as a triage nurse, Mr. Mouch was responsible for making the initial assessment of incoming patients, prioritizing the status of those patients, and monitoring his patients' vital signs. (Pls.' Ex. 5: *Page 5 
9/27/07 Dep. of Nurse Mouch at 7:9-14.) Prior to starting work at Hasbro, Nurse Mouch, a Louisiana native and traveling nurse agency employee, attended a one-day orientation program. Id. at 8:1-9. It is unclear from the record whether Nurse Mouch was given any training with respect to the Hospital's translation or interpreter policies during his orientation. Id. at 9:3-9.
By all accounts, the Hospital was not notably busy at the time the Castillos arrived at the emergency room. (Tr. 12/1/08, AM Session at 13:5-6; Tr. 12/5/08, AM Session at 46:12.) Nurse Mouch took a history of the patient from Guillermo, who conveyed information to Nurse Mouch using both "broken English" and hand signs or gestures. (Pls.' Ex. 9: 9/18/01 Mem. from Joan Flynn at 1; Pls.' Ex. 5 at 17:9-23, 93:23; Tr. 11/21/08, AM Session at 44:2-8.) At some point, Guillermo demonstrated to Nurse Mouch that he had "tapped on [Jancy's] chest."[5] (Pls.' Ex. 9 at 1.) Nurse Mouch asked Guillermo if Jancy had stopped breathing.Id. Guillermo responded by saying, "No, no, I don't know." Id.
Nurse Mouch completed his physical examination of Jancy at 3:35 a.m. (Pls.' Ex. 7: Hasbro Children's Hospital Emergency Department Record at 2.) He noted the presence of "fresh dried blood" around Jancy's nose and upper lip; however, he did not find Jancy to be in any acute distress.Id. Consequently, Nurse Mouch classified Jancy as a "stable" priority level three patient. (Pls.' Ex. 5 at 46-47; Pls.' Ex. 7 at 2.) Nurse Mouch never requested the services of a translator during his evaluation of Jancy. (Pls.' Ex. 5 at 14:11.) Nurse Mouch believed that the information provided to him by the EMTs' statements and their accompanying report, coupled with Guillermo's gestures and his ability to speak "broken English," provided a *Page 6 
sufficient foundation for an accurate triage assessment of Jancy's condition. (Pls.' Ex. 5 at 44:10-15.)
At 3:54 a.m., Registered Nurse Claire Winters accompanied Julia, Jancy, and Guillermo to a nearby examination room for post-triage assessment. (Tr. 12/8/08, AM Session at 45:1-3; Pls.' Ex. 7 at 2.) Inside the room, Nurse Winters performed an objective physical exam of the baby and took a patient history. (Tr. 12/8/08, AM Session at 45:4-10.) Pursuant to the physical exam, Nurse Winters documented her observation of blood in Jancy's nares and on her upper lip.[6] (Pls.' Ex. 7 at 2.) The patient history, again elicited primarily from Guillermo, made no reference to the fact that Jancy had stopped breathing or to Guillermo's resuscitative efforts.[7] (Tr. 12/8/08, PM Session at 10:18 — 11:4.)
Dr. Carrie Wagner entered the examination room at 4:00 a.m. (Tr. 12/5/08, AM Session at 47:16; Pls.' Ex. 7 at 2.) Dr. Wagner, a first-year pediatric resident in her second week of shifts in the emergency department rotation, introduced herself to the Castillos, then proceeded to obtain a history of the patient from Guillermo. (Tr. 12/5/08, AM Session at 37:14 — 38:10, 48:1-3, 48:22.) Using some English, Guillermo conveyed to Dr. Wagner that Julia had fallen asleep while breastfeeding Jancy, subsequently woke up, then began screaming. (Tr. 12/5/08, AM Session at 48:22 — 49:2.) Guillermo also relayed his observation of blood around Jancy's nose and demonstrated the procedure that he employed when he pressed on Jancy's chest earlier in the *Page 7 
evening. (Tr. 12/5/08, AM Session at 51:14-17; Tr. 11/21/08, AM Session at 47:12-18.) Dr. Wagner contemporaneously documented the history that she obtained from Guillermo on the "HPI" ("History of Present Illness") portion of Jancy's Emergency Physician Record, commonly referred to as a "T-sheet." (Tr. 12/5/08, AM Session at 49:19-24; Pls.' Ex. 7 at 3.) Dr. Wagner wrote:
 Mom feeding baby in bed fell asleep. Awoke baby bleeding from nose, around mouth @ breast. Dad Uncle called came. Dad Uncle pressed on chest baby started crying. Rescue called.[8] (Pls.' Ex. 7 at 3; Tr. 12/05/08, AM Session at 50:1-9.) (Indented for emphasis.)
Dr. Wagner also conducted a "review of systems" by asking a series of questions based on a number of symptoms listed on the T-sheet. (Tr. 12/5/08, AM Session at 59:3-14; Pls.' Ex. 7 at 3.) One of the symptoms that Dr. Wagner asked about was "trouble breathing." (Tr. 12/5/08, AM Session at 60:10-13.) Based on Guillermo's responses to her questions, Dr. Wagner placed a check on the T-sheet in the box next to "all systems negative." (Tr. 12/5/08, AM Session at 59:6-14; Pls.' Ex. 7 at 3.) At no point during his interaction with Dr. Wagner did Guillermo affirmatively ask Dr. Wagner to summon an interpreter.[9] (Tr. 11/21/08, AM Session at 48:23; Defs.' Ex. D: 9/20/01 Mem. from Barbara Medeiros at 2.) Nor did Dr. Wagner ever feel that the services of a translator were required. (Tr. 12/5/08, AM Session at 69:17-20.) Interestingly, however, Dr. Wagner did document that the history she obtained from the Castillos was "limited by language." (Pls.' Ex. 7 at 3.) *Page 8 
At approximately 4:30 a.m., Defendant Dr. Gregory Lockhart met with Dr. Wagner near the nursing station outside the examination room. (Tr. 12/8/08, PM Session at 44:12-21.) Dr. Wagner informed Dr. Lockhart of the circumstances surrounding Jancy's case, including the fact that Guillermo had "pressed" on Jancy's chest. Id. at 44:24 — 45:23. Additionally, Dr. Wagner suggested to Dr. Lockhart that he consider performing his own independent review of systems because she knew that he spoke some Spanish. (Tr. 12/1/08, AM Session at 38:20 — 39:3.)
Upon entering the examination room, Dr. Lockhart introduced himself, in Spanish, to Guillermo. (Tr. 12/1/08, AM Session at 62:1-5; Tr. 12/8/08, PM Session at 48:14-25.) Guillermo responded by informing Dr. Lockhart that he could speak "some English." (Tr. 12/1/08, AM Session at 71:19-25.) Based on Guillermo's representation, Dr. Wagner took Jancy's history from Guillermo in English. (Tr. 12/8/08, PM Session at 50:15-23.) Additionally, pursuant to Dr. Wagner's suggestion, Dr. Lockhart conducted his own review of systems in Spanish, posing his questions directly to Julia. (Tr. 12/1/08, PM Session at 33:3-7, 35:4-8, 35:16-18; Tr. 12/9/08, AM Session at 42:2-19, 44:20-22.)
Furthermore, Dr. Lockhart performed a physical exam of Jancy. (Tr. 12/9/08, AM Session at 52:22-24.) Using a cotton swab, Dr. Lockhart removed some dried blood from just below Jancy's nostrils. Id.
at 54:4-15. While examining Jancy's abdomen, Dr. Lockhart noted (and documented) that Jancy's spleen tip was palpable. (Tr. 12/9/08, AM Session at 53:7-15; Pls.' Ex. 7 at 2.) Because an enlarged spleen can be indicative of a low platelet count (which can prompt spontaneous nose bleeds), Dr. Lockhart felt that blood work was necessary. (Tr. 12/9/08, AM Session at 53:18-24.) Upon completion of his physical exam, Dr. Lockhart conferred with Dr. Wagner about their findings, ordered blood tests, then went off to see other emergency room patients. Id.
at 56:11-22, 57:3-9, 58:10-17. *Page 9 
At 5:30 a.m, Nurse Winters re-entered the examination room, connected Jancy to an intravenous drip, and drew two vials of Jancy's blood. (Tr. 12/8/08, AM Session at 48:12-21, 49:8-9; Pls.' Ex. 7 at 5, Emergency Department Flow Sheet.) The laboratory results of the blood tests, printed at 6:07 a.m, showed no indication of any bleeding disorders. (Tr. 12/9/08, AM Session at 21:2-4; Pls.' Ex. 7 at 6, Department of Pathology Stat Report.) Consequently, Dr. Lockhart and Dr. Wagner decided that Jancy could go home. (Tr. 12/5/08, AM Session at 70:21-22.)
Nurse Winters returned to the examination room at 7:00 a.m. and took Jancy's vital signs, which were normal. (Tr. 12/8/08, AM Session at 52:1-2; Pls.' Ex. 7 at 5.) Shortly afterwards, Dr. Wagner formally discharged Jancy. (Tr. 12/5/08, AM Session at 70:21-22, 72:17-18.) In doing so, Dr. Wagner gave the Castillos a printed form, written in English, containing general preprinted instructions, as well as additional instructions handwritten by Dr. Wagner. (Tr. 12/9/08, AM Session at 22:19-23; Pls.' Ex. 7 at 7, Discharge Instructions.) The additional instructions directed Julia to "[c]all pediatrician or come back to ER if baby experiences bleeding again (nose, mouth, urine, stool). Tell pediatrician about trip to the ER." (Pls.' Ex. 7 at 7.) Subsequently, at approximately 7:30 a.m., Jorge arrived at the emergency room and drove Julia, Jancy, and Guillermo back to 167 Cleveland Street. (Tr. 11/21/08, AM Session at 56:3-4.)
Around midday, Jorge and Guillermo left the house to go to work. (Tr. 12/8/08, AM Session at 11:5-7.) Prior to their departure, both men observed Jancy sleeping in her bassinet. (Tr. 11/21/08, PM Session at 56:23 — 57:7; Tr. 11/25/08, PM Session at 36:10-14.) Several hours later, midway through his workday shift, Jorge telephoned Julia and asked about Jancy's demeanor. (Tr. 11/25/08, PM Session at 36:19.) Julia told Jorge that Jancy wasn't eating well. *Page 10 Id. at 36:20-21. Jorge responded by voicing concern over Jancy's condition and told Julia that they should bring Jancy back to the Hospital for further evaluation. Id. at 37:4-7.
After speaking with Julia, Jorge told his friend and co-worker, Luis Morales, that he had to leave work early in order to bring his daughter back to the Hospital. (Tr. 12/5/08, AM Session at 7:13-14.) Jorge proceeded to his car; however, the vehicle would not start.Id. at 38:3-6. Because he had little cash on his person, Jorge decided to walk the four-mile commute.[10] Id. at 38:8.
Upon realizing that Jorge had departed for home on foot, Luis drove off in search of his friend. (Tr. 12/5/08, AM Session at 9:15 — 10:3.) However, Luis was unsuccessful in his attempt to locate Jorge.Id. at 10:4-5. Consequently, Luis attempted to rendezvous with Jorge at the Castillo residence. Id. at 10:6-7. When Luis arrived at 167 Cleveland Street, Julia answered the door and let Luis into the house.Id. at 10:19 — 11:5; (Tr. 11/14/08, AM Session at 3:8-21.) Julia then returned to the upstairs bathroom to finish getting dressed in anticipation of the return trip to the Hospital. (Tr. 11/14/08, AM Session at 3:22-24.)
Some time later, Jorge arrived home. (Tr. 12/5/08, AM Session at 14:5-10.) He announced his arrival by calling out to Julia. (Tr. 12/8/08, AM Session at 21:12-16; Tr. 11/14/08, AM Session at 6:9-15.) Shortly afterwards, Julia exited the bathroom and went to retrieve Jancy from her bassinet. (Tr. 11/14/08, AM Session at 7:8-9.) As Julia's eyes fell upon her daughter, Julia realized that Jancy was not breathing.Id. at 7:9-12. Julia cried out for Jorge, who rushed to the upstairs bedroom. (Tr. 12/8/08, AM Session at 23:2-5.) Upon seeing his unresponsive daughter, Jorge attempted to perform the resuscitative efforts that he witnessed *Page 11 
Guillermo perform in the early hours of the morning. (Tr. 11/14/08, AM Session at 7:20-21; Tr. 12/8/08, AM Session at 24:1-4.) However, Jancy remained unresponsive. (Tr. 11/14/08, AM Session at 8:1.) Jorge frantically dialed 911, then passed the receiver to Luis, who informed the operator of Jancy's distressed condition. (Tr. 12/5/08, AM Session at 20:5-17; Tr. 12/8/08, AM Session at 23:14-19; Defs.' Ex. B: Forensic Tr. at 2.)
Providence Public Safety dispatched an ambulance to the Castillo residence at 7:16 p.m. (Pls.' Ex. 4: Providence Public Safety Incident Report.) As the ambulance pulled up to the house and rescue personnel exited the vehicle, Jorge ran towards them, holding out Jancy's lifeless body. (Tr. 12/8/08, AM Session at 23:20 — 24:4; Pls.' Ex. 10: EMS Ambulance Run Report.) The EMTs took custody of the child, commenced CPR, and departed for the Hospital. (Pls.' Ex. 10.)
Shortly after the ambulance sped off, Luis drove Juila and Jorge to the emergency room. (Tr. 11/14/08, AM Session at 9:16-24.) At 8:40 p.m., the Castillos met with Dr. Lesley Ann Doughty. (Pls.' Ex. 11: Rhode Island Hospital Medical Record at 7, Emergency Department Flow Sheet.) Though the Castillos did not affirmatively request the presence of an interpreter, an interpreter was present. (Tr. 11/14/08, AM Session at 11:10-13, 11:23-25.) Through the interpreter, Dr. Doughty explained to the Castillos that Jancy had been admitted to the Hospital's pediatric intensive care unit.[11]
The facts relating to Jancy's hospital stay are not in dispute. Jancy was placed on a respirator which eventually restored her cardiac and respiratory functions. However, over the following days, it became increasingly clear to the health care providers at the Hospital that Jancy had suffered a prolonged period of oxygen deprivation resulting in irreparable damage to *Page 12 
Jancy's brain. According to the doctors, Jancy would never regain cognitive functions. Four days later, a decision was made to remove Jancy from the life support systems. Consequently, Jancy Castillo-Monterroso passed away on September 19, 2001.
As a result of the death of their daughter, Plaintiffs Julia and Jorge Castillo-Monterrosso, individually and as co-administrators of the estate of Jancy Yesenia Castillo-Monterrosso, instituted the present medical negligence complaint against the agents and employees of Rhode Island Hospital (Nurse Mouch, Nurse Winters, and Resident Dr. Carrie Wagner) and Defendant Dr. Gregory Lockhart. The complaint sets forth claims for wrongful death and parental loss of society and companionship under the Rhode Island Wrongful Death Act, G.L. 1956 § 10-7-1 etseq. This Court's jurisdiction is pursuant to G.L. 1956 § 8-2-14.
 II Standard of Review
In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences."Id. The factual determinations and credibility assessments of a trial justice "traditionally accords a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of theDissolution of Anderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006). Accordingly, the factual findings of a trial justice sitting without a jury will not be disturbed "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked *Page 13 
material evidence or unless the decision fails to do substantial justice between the parties." Grady v. Narragansett Electric Co., 2009 WL 49816,5 (R.I. 2009) (citations omitted). Although the Court has made specific findings of fact in the instant matter, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. Rule 52(a).
Having unraveled the competing, confusing, and often contradictory contentions as to "who said what to whom" and whether what was said was accurately conveyed and understood by the listener(s) in Section I,supra, the Court next turns to the analysis of the controlling legal issues in the present matter.
 III Analysis A Elements of Liability
At the outset, it must be noted that in order for the Plaintiffs to recover for the wrongful death of Jancy, they must prove the following elements by a preponderance of the evidence: 1) that there was a duty of care, or, as stated in medical negligence cases, a standard of care that was required of the emergency department medical staff in their treatment of Jancy; 2) that there was a violation of the applicable standard of care; and 3) the violation of that standard of care proximately caused Jancy's death. See Mandros v. Prescod, 948 A.2d 304,310 (R.I. 2008). With these elements in mind, the Court now begins an examination of the expert testimony proffered by both parties to determine if a case of medical negligence has been sufficiently proven. *Page 14 
 B Expert Testimony
Determinations of trial justices regarding the competency of expert witnesses have traditionally been afforded great latitude. "The test of qualification as an expert witness lies in the sound discretion of the trial justice, and his or her determinations in this regard will not be disturbed in the absence of clear error or abuse." Ferland Corp. v.Bouchard, 626 A.2d 210, 215 (R.I. 1993) (citations omitted). In addition, when a trial justice sits as the finder of fact and evaluates the testimony of properly qualified experts, "[the] trial justice retains the authority to determine the credibility of each expert's evidence. . . ." Conti v. Rhode Island Economic Development Corp.,900 A.2d 1221, 1238 (R.I. 2006) (citations omitted).
 1 Standard of Care
In the instant matter, the Plaintiffs relied upon the testimony of three medical doctors on the issue of standard of care. Plaintiffs' first expert witness, Dr. Alan Bedrick, a board certified neonatologist, is presently affiliated with the College of Medicine at the University of Arizona, where he serves as chief of the section of neonatology.[12] (Pls.' Ex. 15: Curriculum Vitae of Dr. Alan Bedrick.) At trial, based on his review of materials relating to the history and treatment of Jancy on September 15, 2001, Dr. Bedrick noted that during the first emergency department visit, Nurse Mouch asked Guillermo whether Jancy had stopped breathing. Dr. Bedrick described Guillermo's reply ("No, no, I don't know") as an equivocal response to a critical question. Dr. Bedrick testified that in light of a response of that nature, greater investigation was *Page 15 
required than what was subsequently done by the emergency department staff. (Tr. 11/17/08, AM Session at 24:5-14.)
In addressing the first "at home" incident involving Jancy, Dr. Bedrick opined that Jancy experienced an apneic[13] episode at the Castillo residence during the early morning hours of September 15, 2001, and that episode constituted an apparent life threatening event, or "ALTE." Id. at 13:21 — 14:7, 17:8-24. According to Dr. Bedrick, hospital stays of 48 to 72 hours in duration are common admission periods for infants that experience an ALTE. Id. at 50:12-24. Further, Dr. Bedrick testified that had Jancy been admitted pursuant to the Castillos' first emergency room visit, her second apneic episode would have occurred during her hospitalization, and, consequently, Jancy would have survived because she would have been closely monitored for any respiratory or heart difficulties during that period. Id. at 51:8-23.
The testimony of a second expert witness, Dr. Jeffrey Schor, concurred with Dr. Bedrick's opinion that Jancy had experienced a life threatening event necessitating admission to the Hospital. Based on his review of relevant materials, Dr. Schor stated that the Hospital's failure to admit Jancy following her initial trip to the emergency room violated the applicable standard of care, which prescribes cardiac and respiratory monitoring for a period of at least 24 hours when an infant experiences an ALTE. (Tr. 11/18/08, AM Session at 16:16 — 17:19, 28:21-25, 29:17-25.) The Court notes that while Dr. Schor does not have the extensive hospital experience possessed by other physicians[14]
involved in this case, he is board certified in both pediatrics and pediatric emergency medicine and therefore certainly qualified to render opinions *Page 16 
on the issues pertinent to this matter. (Tr. 11/18/08, AM Session at 2:4-5; Pls.' Ex. 16: Curriculum Vitae of Dr. Jeffrey Schor.)
The third medical witness testifying for the Plaintiffs on the issue of standard of care was Dr. Diane Sixsmith. The testimony of Dr. Sixsmith was based in part on her particularly relevant practical experience supervising the pediatric emergency department in a hospital (New York Hospital, Queens) that serves one of the most ethnically diverse populations in the United States. (Tr. 11/24/08, AM Session at 2:21-23, 10:4-10.) In testifying as to the relevant standard of care with respect to emergency room nursing services, Dr. Sixsmith stated that it is incumbent upon emergency room health care providers to obtain an accurate history from incoming patients to ensure that those patients receive an appropriate level of care. Id. at 33:13 — 34:1. Moreover, Dr. Sixsmith stated that the importance of ensuring the accuracy of a patient's history is heightened when the incident that precipitates an emergency room visit is catastrophic in nature. Id. at 15:13 — 16:1.
Dr. Sixsmith further testified that incoming emergency room patients are not required to affirmatively request the services of a translator.Id. at 41:23 — 42:25. Conversely, Dr. Sixsmith emphatically stated that healthcare providers bear the burden with respect to determining whether an interpreter is needed and that when any doubt arises as to whether the presence of an interpreter is necessary, healthcare providers are obligated to utilize translation services. Id. at 45:16 — 46:9.
In the instant matter, Dr. Sixsmith was of the opinion that the words and gestures of Guillermo, coupled with Guillermo's equivocal response when he was initially asked by Nurse Mouch if Jancy had stopped breathing, necessitated further inquiry facilitated by the assistance of a professional interpreter. Id. at 22:8 — 23:17, 31:3-15. The Court is mindful that Dr. Sixsmith *Page 17 
acknowledged that an interpreter is not needed in every case.Id. at 26:8-9, 27:7-10. She emphasized, however, that believing someone appears to understand is not sufficient when communicating sophisticated concepts. Id. at 31:16 — 32:5, 53:3-18. She maintained that nurses must obtain a detailed and accurate history and that this was not done by the nursing staff in assessing Jancy. Id. at 15:6-9. Accordingly, Dr. Sixsmith opined that the Hospital's nursing staff failed to properly discharge their duties, which constituted a violation of the relevant standard of care. Id. at 13:17 — 14:5.
To counter the Plaintiffs' contentions, the Defendants called Dr. Sharon Day to testify regarding the standard of care applicable to pediatric emergency room health care providers practicing in September of 2001. (Tr. 12/2/08, AM Session at 15:24-25, 16:1-7.) Dr. Day, board certified in pediatrics and pediatric emergency medicine, currently practices at the Innova Fairfax Hospital in Falls Church, Virginia. (Defs.' Ex. GG: Curriculum Vitae of Dr. Sharon Day; Tr. 12/2/08, AM Session at 3:15 — 4:1.) Testifying at trial as an expert witness for the first time, Dr. Day opined that as of September 2001, pediatric emergency room health care providers were under no duty to obtain an interpreter every time they endeavored to treat patients who did not use English as their primary language. (Tr. 12/2/08, AM Session at 5:21-25, 19:17-20.) Rather, Dr. Day testified that deciding to utilize or forego the services of an interpreter amounted to a "judgment call" that emergency room health care providers had to make based on whether or not they felt they could communicate effectively with the patient at issue.Id. at 19:21 — 20:2.
Based on her review of the records in the instant matter, Dr. Day opined that all of the healthcare providers who treated Jancy during her initial visit to the Hospital's emergency room met or exceeded the relevant standard of care. Id. at 17:1 — 19:16. Dr. Day's conclusions were grounded in her belief that the communication between Guillermo and the Hospital staff was *Page 18 
such that Guillermo effectively conveyed a history of the events that transpired prior to Jancy's initial trip to the Hospital emergency room. (Tr. 12/2/08, PM Session at 81:2 — 82:18, 85:5-13.)
Dr. Day testified in the substantive areas primarily addressed by Plaintiffs' experts, Drs. Schor and Sixsmith. Just as a trial justice in a non-jury trial may evaluate the credibility of evidence presented by laypersons, "he or she may do the same when dealing with evidence of experts." Harvard Pilgrim Health Care of New England, Inc. v.Gelati, 865 A.2d 1028, 1035 (R.I. 2004) (citing Ferland Corp.,626 A.2d at 216). In assessing the testimony of Drs. Schor, Sixsmith, and Day, the Court finds Drs. Schor and Sixsmith to be more experienced, credible, and persuasive than Dr. Day on the issue of standard of care. Consequently, the Court finds that the Defendants had a duty to more accurately and completely assess what had happened to Jancy prior to her initial arrival at the Hospital's emergency department based upon the various notations of language difficulties in the rescue and medical records as well as the equivocal response of Guillermo regarding whether Jancy had stopped breathing.
The Court further finds that the Defendants failed to recognize that Jancy experienced a life-threatening event at the Castillo residence during the early morning hours of September 15, 2001. Pursuant to the applicable standard of care, that event required admission to the Hospital for a 24 to 72 hour observation period. This was not done. Accordingly, the Hospital's failure to admit Jancy constituted a violation of the applicable standard of care.
 2 Causation
The Plaintiffs presented Dr. Elizabeth Laposata to elaborate on the relationship between the violations of the standard of care in treating Jancy (as testified to by Drs. Bedrick, Schor and Sixsmith), and the cause of Jancy's death. Dr. Laposata stated her opinion that the cause of *Page 19 
Jancy's death was "acute tracheobronchitis and bronchiolitis consistent with Respiratory Syncytial Virus (RSV) infection." (Pls.' Ex. 13: Autopsy Report of Jancy Castillo-Monterrosso at 8; Tr. 11/20/08, AM Session at 18:7-11.) Notably, at the time of the events that gave rise to this case, Dr. Laposata was serving as Chief Medical Examiner for the State of Rhode Island. (Pls.' Ex. 17: Curriculum Vitae of Dr. Elizabeth Laposata; Tr. 11/20/08, AM Session at 4:17-5:2.) Consequently, Dr. Laposata reviewed the autopsy report penned by Dr. Jennifer Swartz and the findings therein prior to the commencement of this litigation and endorsed those findings at that time. (Pls.' Ex. 13 at 8; Tr. 11/20/08, AM Session at 6:6-25, 7:6-15.) At trial, Dr. Laposata reiterated her belief and confidence in the autopsy results as originally reported by Dr. Swartz. (Tr. 11/20/08, AM Session at 18:7-11.) Dr. Laposata further stated that apneic episodes are characteristic of RSV, and that a lung infection was the underlying cause of Jancy's apneic events.Id. at 31:20-22, 32:14-23.
The Defendants presented two medical experts to controvert the contentions of Dr. Laposata. Dr. Alice Werner, Chief of the Division of Pediatric Pathology at Children's Hospital of The King's Daughters in Norfolk, Virginia, opined that the cause of death as determined by the Rhode Island Medical Examiner's Office was erroneous and that Jancy's death was ultimately caused by ventilator-acquired pneumonia. (Tr. 11/26/08, AM Session at 10:9 — 11:5, 32:11-16; Tr. 11/26/08, PM Session at 1:11-13.) Dr. Werner explained that when an ailing child is placed on a respirator, the accompanying intubation process can cause bacteria to be introduced into the lungs of the patient. (Tr. 11/26/08, PM Session at 1:14 — 2:2.) Dr. Werner further testified that it was her opinion, based primarily on her review of Jancy's autopsy report and accompanying slides produced by the Rhode Island Medical Examiner's Office, that Jancy *Page 20 
eventually succumbed to a bacterial infection of this nature.[15] (Tr. 11/26/08, AM Session at 8:25 — 9:2, 62:10-12.)
The Defendants' final expert witness, Dr. Cynthia Cole, an attending neonatologist at Boston Medical Center, also testified on the issue of causation. (Tr. 12/3/08, AM Session at 1:24 — 2:4, 2:18-20, 19:22 — 20:5.) Specifically, Dr. Cole opined that Jancy never evidenced the classic symptoms of RSV at any point during her first visit to the emergency room, nor did she display RSV symptoms during her subsequent admission to the Hospital's pediatric intensive care unit. Id.
at 20:4-5, 20:14-24, 29:16-20. Dr. Cole testified that the typical presenting symptoms of an infant afflicted with RSV include rhinorrhea, increased breathing, respiratory distress, and wheezing. (Tr. 12/3/08, AM Session at 20:25 — 21:4.)
Notably, Dr. Cole further testified that, though unusual, an apneic episode can constitute a first presenting symptom of RSV. Id.
at 21:23-24. However, Dr. Cole stated that in cases where apnea is the sole presenting symptom, other observable symptoms would manifest themselves in short order. Id. at 24:12 — 25:1. Dr. Cole based her opinion on her review of relevant materials related to Jancy's case, coupled with her clinical experience diagnosing the symptomology of RSV in infants.Id. at 5:14 — 8:19.
The opinions of Drs. Cole and Werner regarding the cause of death are contrary to those of Plaintiffs' expert, Dr. Laposata. Our Supreme Court has explicitly stated that "[i]t is well within the discretion of the trial justice to accept the opinion of one expert, while rejecting the opinion of another expert." Sun-Lite Partnership v. Town of WestWarwick, 838 A.2d 45, *Page 21 
48 (R.I. 2003). After a careful review of the relevant testimony, the Court places greater weight in the opinions of Dr. Laposata regarding the cause of Jancy's death.
The Court is mindful of the Defendants' contention that a medical examiner's experience with RSV can be distinguished from a pediatric pathologist's experience with the same virus in that the former observes a stagnant manifestation of the organism in deceased individuals while the later must contend with an active and evolving pathogen in living patients. Notwithstanding this distinction, the Court accepts the opinions of Dr. Laposata in this matter. Dr. Laposata's testimony, as a whole, was precise, measured, and confident. Moreover, Dr. Laposata's endorsement of the autopsy findings prior to the commencement of this litigation buttressed her already credible trial testimony. Accordingly, the Court finds that the cause of Jancy's death was an apneic event triggered by acute tracheobronchitis and bronchiolitis consistent with RSV infection.
 C Liability
The Court finds that the greater weight of the credible evidence in the record as recounted in Sections I and III B, supra, establishes: 1) that the Defendants had a duty to more accurately and completely assess what had happened to Jancy prior to her initial arrival at the Hospital's emergency department based upon the various notations of language difficulties in the rescue and medical records as well as the equivocal response of Guillermo regarding whether Jancy had stopped breathing; 2) that the Defendants failed to recognize that the seven-day-old infant had experienced a life-threatening event that required admission to the Hospital for a 24 to 72 hour period; and 3) that the Defendants' failure to diagnose the occurrence of the initial RSV-induced apneic event and their subsequent failure to admit Jancy ultimately caused Jancy's death. *Page 22 
Therefore, the Court finds that the Plaintiffs have established the elements of their medical negligence claim by a preponderance of the credible evidence.
 IV Damages
Having determined that the Plaintiffs should prevail on their medical negligence claim, the Court must make a careful and thorough assessment of the evidence in the record relating to the issue of damages. While mindful of the tragic nature of this case, the Court is duty-bound to decide this issue based upon the credible evidence in the record. This Court is guided by the same admonition it offers to juries when instructing on the issue of damages:
 With respect to each component of damages, you should arrive at your determination of the amount you will award as damages, if any, on the basis of your considered judgment as to what constitutes fair and adequate compensation for those components of damages you find to have been endured by Plaintiff.
 Of course, prejudice, sympathy or compassion should not be permitted to influence you. All that any party is entitled to or expects is a verdict based upon your fair, scrupulous and conscientious examination of the evidence and an application of the law to the facts established by the evidence.[16]
 A Wrongful Death
The fundamental purpose of a wrongful death action is "to compensate survivors for the pecuniary losses they suffer because of the tortious conduct of others." Alexander v. Whitman, 114 F.3d 1392, 1398 (3d Cir. 1997) (citations omitted). The Rhode Island Supreme Court has long averred that "under the common law no action for damages by reason of death by wrongful act could be maintained." Hall v. Knudsen,535 A.2d 772, 774 (R.I. 1988) (citing Carrigan v. Cole, 35 R.I. 162, 165,85 A. 934, 935 (1913)). Consequently, the Rhode Island *Page 23 
General Assembly enacted the Rhode Island Wrongful Death Act, § 10-7-1et seq. (the "Act"), which provides, in relevant part, as follows:
 Whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who, or the corporation which, would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to a felony. Section 10-7-1.
As noted in a recent law review article, "[t]he foundational measure of lost life in the tort system is economic damages. This is a rough measure of the future income of the deceased that is lost to the survivors, sometimes called `loss of support.' It requires a calculation of the deceased's expected earnings for the remainder of his or her life, minus expenditures for the benefit of the deceased, discounted for time." Frank Cross Charles Silver, In Texas, Life is Cheap, 59 Vand. L.Rev. 1875, 1889 (2006). This concept is codified in § 10-7-1.1.[17] *Page 24 
Though it has been some years since the Rhode Island Supreme Court last visited the issue of pecuniary damages awarded under § 10-7-1.1, the Court has previously noted that "[t]he ultimate award in a wrongful death action is based upon a series of predictions none of which involve absolute certainty. [Pecuniary] [d]amages, in such circumstances, are truly incapable of precise proof." Romano v. Duke, 111 R.I. 459, 466,304 A.2d 47, 51 (1973). Some years later the Court addressed the quantum of evidence required for proper calculation of pecuniary damages in wrongful death cases by endorsing a trial justice's statement that "it is not necessary in all [wrongful death] cases to have economists testify [on the issue of prospective income]. The criterion by which [one] must be guided is whether there is enough evidence on each one of [the] three steps [delineated in § 10-7-1.1] from which the jury can make a determination." Taft v. Cerwonka, 433 A.2d 215, 220 (R.I. 1981) (emphasis added).
In the case at bar, the Court finds that requiring trial testimony from an economist or actuary is warranted because an economic projection of this nature, that is, calculating the present value of the earning capacity of a seven-day-old child, is beyond the ken of most laypersons.See id. However, the Plaintiffs have submitted no evidence whatsoever regarding entitlement to economic damages derived from Jancy's putative earning capacity.[18] The dearth of evidence on this issue makes it impossible for the Court to award pecuniary damages under § 10-7-1.1 to the Plaintiffs in the instant matter. See id. *Page 25 
There is, however, a minimum recovery available under the Rhode Island Wrongful Death Act. At the time of Jancy's death, the Act read in relevant part, "[w]henever any person or corporation is found liable under §§ 10-7-1 — 10-7-4 he or she or it shall be liable in damages in the sum of not less than one hundred thousand dollars ($100,000)." Section 10-7-2 (2001). After this litigation was initiated, the minimum recovery called for by § 10-7-2 was increased by the General Assembly at its January 2002 session to $250,000 pursuant to the enactment of P.L. 2002, ch. 320, § 1 and P.L. 2002, ch. 345, § 1.[19] However, despite the increase in the statutory minimum, this Court is bound to apply the law that was in effect at the time the events giving rise to the instant matter transpired. Regarding the applicable law, our Supreme Court has stated that "[e]very court which has considered the issue . . . has found that a subsequent change as to the amount or the elements of damage in the wrongful-death statute to be substantive rather than procedural or remedial, and thus any such change must be applied prospectively." Dempsey v. State, 451 A.2d 273, 273 (R.I. 1982) (citations omitted). Accordingly, judgment is rendered in favor of the Plaintiffs in the amount of $100,000 awarded to Julia Castillo-Monterroso and Jorge Castillo on their wrongful death claim.
 B Loss of Society and Companionship
When parents sue for the wrongful death of a child, damages are not necessarily limited to pecuniary losses. "The real loss sustained by a parent from the wrongful death of a child is not the loss of any financial benefit to be gained from the child, but rather the loss of love, advice, comfort, companionship, and society." 1 Jacob A. Stein,Stein on Damages § 3:37 (3d ed. 1997). This concept is embraced by § 10-7-1.2(c), which states that "[w]henever the death of *Page 26 
an unemancipated minor shall be caused by the wrongful act, neglect, or default of another person, the parent or parents of the minor may recover damages against the person for the loss of the minor's society and companionship."
Legal scholars have noted that "[p]roof of the non-economic loss of society and companionship poses obvious difficulties. . . . The loss is impossible to calculate with precision and must be evaluated on a case-by-case basis, considering the particular parent-child relationship at issue." 3 Jerome H. Nates, Damages in Tort Actions § 24.03[1]. Rhode Island case law accords with this understanding of damage computation in wrongful death cases. Our Supreme Court, in reviewing a wrongful death damage award, has recently stated that "no mathematical formula exists for awarding a plaintiff damages . . . [s]uch an award, however, must be consistent with the evidence and not unduly motivated by sympathy, passion or prejudice." Oliveira v. Jacobson, 846 A.2d 822, 827 (R.I. 2004) (citations omitted). Though Oliveira dealt specifically with review of a wrongful death damage award for pain and suffering pursuant to § 10-7-7, this Court adopts our Supreme Court's directive therein as guidance in evaluating the Plaintiffs' loss of society and companionship claims in the case at bar.
The Court recognizes, as Plaintiffs observe, that "no amount of money could ever compensate these parents for their loss."[20] Any parent who has lost a child would readily agree with this assertion. Though ever mindful of the enormity of such sorrow, the Court cannot assume or speculate when calculating this type of loss. The rule of law relating to an award of monetary damages in wrongful death cases requires a more dispassionate analysis. See id.
Our Supreme Court has not enumerated explicit factors that must be evaluated when awarding damages for loss of society and companionship in cases arising out of the wrongful death of a minor; however, other jurisdictions that allow recovery for loss of society and *Page 27 
companionship in such cases have delineated some factors properly considered in this analysis.
These factors include: "(1) the relationship between . . . parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities."Wellborn v. Sears, Roebuck Co., 970 F.2d 1420, 1429
(5th Cir. 1992) (applying Texas law). Accordingly, in assessing damages in the instant matter, the Court looks to evidence of the relationship between Jancy and her parents prior to her death, or, the next best evidence; that is, credible evidence of the nature and quality of the relationship between Plaintiffs and their two surviving sons, Jorgito and Bhryan, ages 11 and 8.
The Court appreciates that the short duration of Jancy's life presents significant obstacles for the Plaintiffs. However, the Plaintiffs had ample opportunity to educate the Court about the nature, extent, and quality of their relationship with their two sons over a considerable period of time. Regrettably, the Plaintiffs' offer of evidence in this area was surprisingly brief and general in nature. Though the testimony adduced at trial generated a transcript well in excess of one thousand pages, the Court could find only a handful of passages containing witness testimony bearing on loss of society and companionship. Julia was asked only one question about her activities with Jorgito and Bhryan:
 Q: And today what sort of things do you do with Jorgito and Bhryan?
 A: I eat out with them. I take them to the park to play. Sometimes I go out with them to ride a bike. And Bhryan, I registered Bhyran in basketball classes. I do a lot of things with them that I would also like to have done with the baby but she is not here. (Tr. 11/14/08, PM Session at 6:3-9.)
Aside from this brief description of activities with her sons, the Court has little or no evidence relating to Julia's home life with her children or the amount of time actually spent with them. *Page 28 
The questioning and testimony of Jorge in this area, though more extensive than that of Julia, was still quite limited. The following colloquy constitutes the bulk of Jorge's testimony relating to loss of society and companionship:
 Q: What recreational activities do you enjoy with your boys?
 A: Um, the days off, we go skating. I take them to play basketball, to the rivers, we go fishing. Sometimes we just go for walks to the lakes or to the national parks. It is a very beautiful place. It's, you can go a lot of places, and in the morning you feel like going out with the children.
 Q: Do the boys belong to any teams?
 A: Jorgito plays in a soccer team. And Bhryan is in the basketball team, school.
 Q: Do you and your wife go to the games?
 A: When I can I go and Julia can she goes. We both, when we both go we go because I usually work, I usually do it in the afternoon when I don't work.
 Q: How about holiday routines, do you have any holiday routines?
 A: We spent it [with] the rest of the family. We are, we are together. (Tr. 12/1/08, AM Session at 7:17-25, 8:3-12.)
Jorge's answers here and elsewhere acknowledge a tension between his work obligations and his ability to spend time with his children. The Court acknowledges that this sort of tension is universally recognizable and common to working parents across all walks of life. However, damage awards of this nature must not be "unduly motivated by sympathy, passion or prejudice." Oliveira, 846 A.2d at 827. An offer of affirmative evidence relating to damages for loss of society and companionship under § 10-7-1.2(c) is required. See id.
The Court has not callously overlooked the sadness experienced by the Plaintiffs at the loss of their child. Despite the magnitude of such grief, the Court must award damages that *Page 29 
constitute a "reasonable response to the evidence." Romano,111 R.I. at 466, 304 A.2d at 52. In this case, the Court is constrained in its ability to award damages for loss of society and companionship in light of the limited amount of credible evidence in the record that speaks to this issue. See Oliveira at 827. Accordingly, on the evidence before it, the Court awards each Plaintiff $150,000 on their loss of society and companionship claims.
 V Conclusion
The Plaintiffs have established the elements of their medical negligence case by a preponderance of the credible evidence presented at trial. Therefore, the Plaintiffs are entitled to recover from the Defendants an award in the amount of $100,000 on the wrongful death claim, and each Plaintiff is awarded $150,000 on the loss of society and companionship claims. Additionally, the Plaintiffs are entitled to interest on both awards.
[1] There are written postings in the Hospital's emergency department noting the availability of interpreters speaking Portuguese, Spanish, French, Creole, Russian, Cambodian, Laotian, and Armenian. (Defs.' Ex. RR.)
[2] All of the findings of fact, credibility assessments of witnesses, and conclusions herein are based upon the Court's observations, copious trial notes, review of exhibits, and reasonable inferences drawn from trial evidence. The Court acknowledges that it is unusual for a trial justice to cite to a transcript in a bench trial. However, since a transcript was made available to the Court by the parties, the Court has referenced relevant portions of that transcript for the assistance, convenience, and edification of the parties.
[3] In accordance with cultural tradition, Julia has retained her maiden name (`Monterroso'), which accounts for the dissimilarity between Julia and Jorge's surnames. However, this does not account for the fact that Jorge has been identified as Jorge `Castillo-Monterroso' in nearly all documents filed with the Court.
[4] The Court is mindful of the Defendants' assertion that Firefighter Donoghue's witness statement is illustrative of their contention that Guillermo spoke to Firefighter Donoghue in English. (Defs.' Summ. at 4.) In evaluating Firefighter Donoghue's witness statement as a whole, the Court finds this assertion mischaracterizes the evidence.
[5] The exact nature of Guillermo's gestures is a point of contention. The gestures demonstrated at trial by Guillermo, Nurse Mouch, Dr. Carrie Wagner, and Dr. Lockhart bear little similarity to each other. These inconsistencies are not surprising given that over seven years have passed since these gestures were made or observed by the witnesses. The Court finds the repetitive questioning and testimony about the precise details of Guillermo's hand, arm and finger movements and his accompanying vocal sounds or expressions are of little value or assistance because of the divergent recollections of these witnesses.
[6] Nurse Winters also observed that Julia was wearing a gold chain and pendant. (Tr. 12/8/08, AM Session at 47:6-10; Defs.' Ex. C: 9/19/01 Mem. from Barbara Medeiros at 1; Defs.' Ex. U: Photographs of chain and pendant.) Nurse Winters thought there was a possibility that the chain or pendant had scratched Jancy's nose thereby causing her nosebleed. (Defs.' Ex. C at 1.) However, subsequent investigation into this possibility by the health care providers led to inconclusive findings on the matter. (See Tr. 12/5/08, AM Session at 67:2-10, 68:5-8; Tr. 12/1/08, PM Session at 36:5 — 37:10, 38:16 — 39:11.)
[7] The patient history documented by Nurse Winters reads in its entirety: "[P]er father mom fell asleep while breastfeeding. When she awoke, blood coming out of babys [sic] nose." (Pls.' Ex. 7 at 2.) The reference to Jancy's "father" was the result of Nurse Winters' mistaken belief that Julia and Guillermo were Jancy's parents. (Tr. 12/8/08, AM Session at 43:12-13.)
[8] The strikethroughs in Dr. Wagner's notation were the result of her initial mistaken belief that Guillermo was Jancy's father. (Tr. 12/5/08, AM Session at 48:17-19.)
[9] The Court finds the Plaintiffs' assertion that they repeatedly requested the services of a professional interpreter unpersuasive. However, the Court finds that the Plaintiffs' failure to affirmatively request such services is not dispositive as to whether a case of medical malpractice has been sufficiently proven. See Section III,infra.
[10] The Court notes that testimony adduced at trial regarding the events surrounding Jorge's departure from work and his subsequent return home was somewhat implausible. Notwithstanding that observation, the events that occurred during this period of time, however they transpired, are not of considerable assistance with respect to resolution of the ultimate issue in this case.
[11] That evening the Castillos also met with Dr. Jonathan Birnkrant, a second-year pediatric resident. (Tr. 12/4/08, AM Session at 36:15-21, 41:17-42:12.) The Court finds that Dr. Birnkrant's trial testimony was directed at matters not relevant to the dispositive issue in this case.
[12] Dr. Bedrick described the medical specialty of `neonatology' as the care and treatment of critically ill "newborns"; that is, premature or full-term babies up to twenty-eight days old. (Tr. 11/17/08, AM Session at 1:20-2:14.)
[13] Dr. Bedrick defined `apnea' as the "cessation of breathing." (Tr. 11/17/08, AM Session at 13:20.)
[14] Dr. Bedrick, Dr. Diane Sixsmith, and Defendant Dr. Lockhart have more "hands-on" hospital pediatric emergency department experience. (See Pls.' Ex. 15; Pls.' Ex. 19: Curriculum Vitae of Dr. Diane Sixsmith; Defs.' Ex. QQ: Curriculum Vitae of Dr. Gregory Lockhart.)
[15] Dr. Werner adhered to the position that bacteria-based ventilator acquired pneumonia was the ultimate cause of death in the present case despite acknowledging the fact that Jancy was given a broad-spectrum antibiotic prior to commencement of the intubation process, as well as subsequent daily doses of the same antibiotic throughout the remainder of her hospital stay. (Tr. 11/26/08, AM Session at 49:9-16; Tr. 11/26/08, PM Session at 4:6 — 5:23.)
[16] Excerpt from standard jury instruction utilized by this Court on the issue of damages.
[17] Section 10-7-1.1 provides that pecuniary damages recoverable by wrongful death beneficiaries are to be ascertained as follows:
 (1) Determine the gross amount of the decedent's prospective income or earnings over the remainder of his or her life expectancy, including all estimated income he or she would probably have earned by his or her own exertions, both physical and mental. Pecuniary damages shall include the value of homemaker services lost as a result of the death of a homemaker. The fair value of homemaker services shall not be limited to moneys actually expended to replace the services usually provided by the homemaker. In such a suit, the value of homemaker services may be shown by expert testimony, but expert testimony is not required.
 (2) Deduct from the amount determined in subdivision (1) the estimated personal expenses that the decedent would probably have incurred for himself or herself, exclusive of any of his dependents, over the course of his or her life expectancy.
 (3) Reduce the remainder thus ascertained to its present value as of the date of the award. In determining the award, evidence shall be admissible concerning economic trends, including but not limited to projected purchasing power of money, inflation, and projected increase or decrease in the costs of living.
[18] Indeed, in a pretrial memo regarding an unrelated issue, Plaintiffs' counsel delineated the scope of damages sought by stating that:
 [T]he jury will be called upon to make an assessment of damages only with respect to Plaintiffs [sic] claims for loss of society and companionship. The jury will not be required to determine the value of the [sic] Jancy's lost future earnings and will not be presented with any evidence as to Jancy's parents' earnings as a basis for such calculations, as Plaintiffs are seeking to recover only the statutory minimum for so-called wrongful death damages. (Mem. in Support of Pls.' Mot. in Limine to Exclude Evidence at 2, Filed 8/25/08) (emphasis in original).
[19] While there are two (2) Public Laws citations, they are the respective House and Senate versions of the legislation which are identical.
[20] Pls.' Closing Argument Mem. at 18. *Page 1